# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

K&G CONCORD, LLC and CSS            )
CONCORD, INC.,                     )
                                   )
            Plaintiffs,            )
                                   )
      v.                           )       C.A. No. 12563-VCMR
                                   )
CHARCAP, LLC, CHARCOAL PIT,        )
INC. and KITCHEN SINK, INC.,       )
                                   )
            Defendants.            )

## MEMORANDUM OPINION

Date Submitted: May 26, 2017
Date Decided: August 1, 2017

Basil C. Kollias and Douglas J. Cummings, Jr., KOLLIAS LAW, LLC, Wilmington, Delaware; *Attorneys for Plaintiffs.*

Kelly E. Farnan and Travis S. Hunter, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendants.*

**MONTGOMERY-REEVES, Vice Chancellor.**

This case involves two well-known Delaware restaurants located on Concord Pike in Wilmington, the Charcoal Pit and the Claymont Steak Shop. The Charcoal Pit is a long-revered Delaware institution, a nostalgic symbol to many native Delawareans of hamburgers and milkshakes. The Claymont Steak Shop is a relative newcomer to the sale of cheesesteaks, but the great success of its original location led the owners to open another Claymont Steak Shop restaurant next door to the Delaware stalwart. The parties initially entered into a bidding war for the property, with the owners of the Claymont Steak Shop winning out.

This dispute arose after the Claymont Steak Shop, following a year-long extensive construction period, opened its doors and its numerous customers and large delivery trucks began driving over the neighboring Charcoal Pit property. The Charcoal Pit's owners erected a fence to abate the high traffic. The Claymont Steak Shop's owners bring this suit claiming there is an implied easement over the Charcoal Pit property to allow the Claymont Steak Shop's employees, customers, and vendors to reach the stoplight and the northbound lanes of Concord Pike. The plaintiff restauranteurs contend that their competitor has caused significant damage to their business and their vendor relationships by erecting the fence. For the reasons discussed below, I find that no easement by estoppel or prescription exists, and the defendants are within their rights to construct a fence on their private property.

# I. BACKGROUND

These are my findings of fact based on the parties' stipulations, over 420 documents, and testimony of thirteen witnesses during a three-day trial that occurred on March 15-17, 2017. I accord the evidence the weight and credibility I find it deserves.[1]

## A. Parties and Relevant Non-Parties

Plaintiff K&G Concord, LLC ("K&G") is a Delaware limited liability company owned by husband-and-wife Basil Kollias and Dimitra Kollias.[2] Mr. Kollias has been a Delaware transactional real estate attorney for over fifteen years.[3] Plaintiff CSS Concord, Inc. ("CSS") is a Delaware corporation also owned by the Kolliases (CSS, collectively with K&G, "Plaintiffs").[4] K&G currently owns the property located at 2720 Concord Pike, Wilmington, Delaware (the "2720

---

[1] Citations to testimony presented at trial are in the form "Tr. # (X)" with "X" representing the surname of the speaker, if not clear from the text. After being identified initially, individuals are referenced herein by their surnames without regard to formal titles such as "Dr." No disrespect is intended. Exhibits are cited as "JX #," and facts drawn from the parties' Joint Pre-Trial Stipulation and Order are cited as "PTO ¶ #." Unless otherwise indicated, citations to the parties' briefs are to post-trial briefs.

[2] PTO ¶ 1.

[3] *Id.*

[4] *Id.* ¶ 2.

Property").[5]  CSS is the tenant of K&G on the 2720 Property and operates the Claymont Steak Shop restaurant.[6]

Defendant Charcap, LLC ("Charcap") is a Delaware limited liability company owned by Louis Capano, Jr. ("Capano") and Louis Capano, III, a father-and-son real estate development team.[7]  Charcap owns the property located at 2600 and 2706 Concord Pike, Wilmington, Delaware (the "Charcap Property").  The Capanos also own the property directly to the south of the Charcap Property at 2530 Concord Pike, Wilmington, Delaware ("2530 Property").[8]  The Charcap Property has two tenants, the Charcoal Pit restaurant (the "Charcoal Pit") and a Dunkin' Donuts.[9]  Defendant Kitchen Sink, Inc. ("Kitchen Sink") operates the Charcoal Pit Restaurant on the Charcap Property (Kitchen Sink, collectively with Charcap, Charcoal Pit, Inc., "Defendants").[10]

---

[5]    *Id.* ¶ 12.

[6]    *Id.* ¶¶ 16-17.

[7]    *Id.* ¶ 3.

[8]    *Id.* ¶ 5.

[9]    *Id.* ¶ 7.

[10]    *Id.* ¶ 8.

4

Non-party Andrew Fox is a commercial real estate agent who represented K&G in its purchase of the 2720 Property.[11] Non-party Grant H. Gregor is a professional land surveyor with Merestone Consultants ("Merestone") and was engaged by K&G to develop a site and parking plan for the 2720 Property.[12] Non-party Steven Donald Kryak was the construction manager hired by K&G for the construction of the Claymont Steak Shop on the 2720 Property.[13]

Non-party Michael Sciota is the Director of Operations for Kitchen Sink and general manager of the Charcoal Pit.[14] Non-party Stephen Lloyd Johns is a professional engineer and professional land surveyor employed with Vandemark & Lynch.[15] The Capanos retained Johns to develop the record plan for the 2530 Property.[16]

---

[11]     Tr. 530 (Fox).

[12]     *Id.* at 552 (Gregor).

[13]     *Id.* at 501 (Kryak).

[14]     PTO ¶ 4.

[15]     Tr. 288 (Johns).

[16]     *Id.*

5

Non-party Ronald Lee Eldredge was the owner-operator of the Dunkin' Donuts on the Charcap Property from 1981 until 1996.[17] Non-party Rajesh Patel is the current owner of the Dunkin' Donuts, having owned it since 1998.[18]

Non-party Stuart Rosen has been a commercial real estate broker for approximately 35 years.[19] In 1993, Rosen was hired by Nationwide Furniture Rentals & Sales, Inc., a predecessor to the various mattress stores that leased the 2720 Property from 1993 to 2012, to find a location for a store on Concord Pike.[20] Rosen handled the preparation of the lease.[21] Non-party Garey McDonald is an employee of Mattressfirm, formerly Sleepy's and Mattress Giant.[22]

Non-party David Cianfaro has been a resident of North Wilmington since 1989 and is a marketing associate for Sysco Foods Philadelphia ("Sysco"), which involves coordinating operations and instructing truck drivers on their delivery routes.[23]

---

[17] *Id.* at 235 (Eldredge).

[18] *Id.* at 621 (Patel).

[19] *Id.* at 383 (Rosen).

[20] *Id.*

[21] *Id.* at 383-85.

[22] *Id.* at 338-44 (McDonald).

[23] *Id.* at 677, 682 (Cianfaro).

**B.    Facts**

**1.    The history of the properties**

Robert Hunt Whitten purchased the 2720 Property in 1961.[24]  Between 1961 and 1964, Whitten developed the previously vacant land and built a photography studio.[25]  In 1973, a traffic light was installed at the intersection of Concord Pike and Woodrow Avenue with a direct entrance onto the Charcap Property.[26]  There is no direct entrance from the Woodrow Avenue light to the 2720 Property.[27]  There also is no direct access from the northbound side of Concord Pike.[28]  The only direct access point to the 2720 Property is from the southbound side of Concord Pike.[29]

Mr. Kollias testified at trial that he visited Whitten's photography studio twice as a child in the 1970s.[30]  Mr. Kollias testified that his family drove from the traffic light at Woodrow Avenue, across the Charcap Property, to access and park on the

---

[24]    JX 314.

[25]    JX 29, at 9, 93, 94; JX 209.

[26]    JX 85.

[27]    JX 49.

[28]    *Id.*

[29]    *Id.*

[30]    Tr. 91-93.

7

2720 Property.[31] Mr. Kollias testified that he had never seen Whitten personally use the Charcap Property to access his own building.[32] From 1964 until 1999, Whitten ran his photography business out of that building.[33]

From 1992 until 1993, Tabriz Oriental Rug Store rented the first floor of the 2720 Property from Whitten.[34] In 1993, a mattress store began to look for a space to open a store on Concord Pike.[35] Rosen, the real estate agent retained by the mattress store to scout out an appropriate location, testified that he had personally accessed the rear of the 2720 Property during his research by way of the traffic light and the Charcap Property.[36] Pursuant to the original lease negotiated and drafted by Rosen, from September 1, 1993 until November 30, 2012, various mattress stores

---

[31]     *Id.*

[32]     *Id.* at 139. Plaintiffs also presented testimony from Eldredge and McDonald regarding use of the Charcap Property. But McDonald and Eldredge did not have personal knowledge of Whitten using the Charcap Property; rather they speculated as to whether common sense or ease would have dictated its use. *Id.* at 241-43, 269 (Eldredge); 358-62 (McDonald).

[33]     JX 29, at 107-14.

[34]     JX 357; Tr. 384-88 (Rosen).

[35]     Tr. 384-88 (Rosen).

[36]     Rosen also testified that "it makes perfect sense" to use the traffic light to get to the rear of the 2720 Property. *Id.* at 414-15.

leased space from Whitten on the 2720 Property.[37] While originally only leasing the bottom level of Whitten's building, a 1999 amendment was executed to expand the lease to the entire second floor after Whitten closed his photography studio.[38] That lease had a parking provision which states:

PARKING:

6. During the term of this Lease and any renewals and/or extensions thereof, Tenant is granted the right of exclusive use of the parking area located directly in front of the Building and the Demised Premises and the right of non-exclusive use of the side and rear parking areas of the Building in conjunction with the occupant of the upper floor of the Building.[39]

Rosen testified at trial that this language does not address how one would enter or exit the property.[40]

McDonald worked for Mattressfirm, Sleepy's, and Mattress Giant, from around 2002 until around 2012.[41] He personally observed traffic patterns to and from the mattress stores.[42] He testified that the mattress store was one of the slow

---

[37]     JX 358; JX 68.  The mattress store changed owners throughout the years, but the business remained the same.

[38]     JX 69; Tr. 438 (Rosen).

[39]     JX 358, at 2.

[40]     Tr. 426.

[41]     *Id.* at 342-44.

[42]     *Id.* at 341.

9

stores with an average of five to ten customers per day who typically parked in the front of the building.[43]  This was corroborated by Patel who testified the mattress store was "not busy at all"; and that sometimes he saw customers parked in front of the store.[44]  McDonald testified that typically six-wheel delivery trucks delivered mattresses from the warehouse about once per week, and they would come up the northbound side of Concord Pike and use the traffic light to access the mattress store.[45]

In 1986, the Capanos bought the Charcoal Pit restaurant, located on the Charcap Property, from Louis Sloan.[46]  From 1986 to 1995, Kitchen Sink leased the land from Sloan and operated the Charcoal Pit Restaurant.[47]  On November 27, 1995, the Capanos, through Charcap, bought the Charcap Property from Sloan.[48]  Sloan executed an affidavit certifying that he knew of no easements that were not provided for in the transaction.[49]  Capano testified that when he purchased the property, he

---

[43]     *Id.* at 371-73.

[44]     *Id.* at 623.

[45]     *Id.* at 363-65.

[46]     *Id.* at 458 (Capano).

[47]     PTO ¶¶ 8-9; Tr. 458-59 (Capano).

[48]     JX 74, at 111; Tr. 459 (Capano).

[49]     JX 80.

was not aware of vehicles using the Charcap Property to access the 2720 Property.[50]

After the sale, Charcap continued to lease a portion of the property to the Dunkin' Donuts.[51]

GasCap, LLC ("GasCap"), another Capano-related entity, owns the 2530 Property.[52] The Bella Coast restaurant operates on the 2530 Property.[53] The record plan for the 2530 Property contains the following note from the Delaware Department of Transportation:

> The Developer should pursue a cross-access agreement with the parcel to the north to establish an interconnection with the existing Charcoal Pit restaurant so that site traffic may utilize the signal located at the intersection of US Route 202, Woodrow Avenue, and The Charcoal Pit entrance.[54]

The cross-access easement between the 2530 Property and the Charcap Property was executed on June 5, 2012.[55]

---

[50] Tr. 460.

[51] JX 74, at 59.

[52] Tr. 289-90 (Johns).

[53] *Id.*

[54] JX 28, at n.33.A; Tr. 292-95 (Johns).

[55] JX 257.

11

### 2. K&G buys the 2720 Property

In 2012, the Kolliases, through K&G, submitted a bid for $715,000 to buy the 2720 Property from Whitten's widow, Ellen Cornish-Whitten.[56] The asking price was $750,000.[57] Capano submitted a competing bid for the property.[58] The Kolliases then submitted another bid a few days later raising the offer from $715,000 to $760,000.[59] Capano submitted a higher bid.[60] Fox told the Kolliases the only way to win the property was to submit an increased offer of $800,000 with a 5 P.M. deadline and a better commission split for Mrs. Whitten's real estate agent.[61]

Mrs. Whitten accepted the $800,000 K&G bid, and the parties executed the sale on November 5, 2012.[62] The agreement allowed for a thirty-day due diligence period.[63] As part of its due diligence, K&G hired Merestone and Ten Bears Environmental, LLC to determine whether future development of the property was

---

[56]    Tr. 536-37 (Fox).

[57]    *Id.* at 532 (Fox).

[58]    *Id.* at 486 (Capano).

[59]    *Id.* at 535 (Fox).

[60]    *Id.* at 487 (Capano).

[61]    *Id.* at 536 (Fox).

[62]    JX 30.

[63]    *Id.*

feasible and to conduct an environmental survey and title search.[64] None of these processes revealed an easement over the Charcap Property.[65] The transaction closed on December 19, 2012.[66] As part of the sale, Mrs. Whitten executed an affidavit stating there were no easements affecting the 2720 Property that had not been provided for in the agreement.[67]

After the closing, the Kolliases began developing the property. Merestone created a record plan and parking plan for the site that included a traffic generation diagram depicting the trips coming in and out of the direct access entrance to Concord Pike.[68] Gregor testified that at the time he prepared the record plan, he informed Mr. Kollias that there was only one entry and exit path on the property and that it would be tight for delivery and garbage trucks to travel along the north side of the building to the Concord Pike entrance.[69] Both the record plan and the

---

[64] *Id.*; Tr. 150-52 (B. Kollias).

[65] Tr. 153 (B. Kollias).

[66] PTO ¶ 12.

[67] JX 43, at 9.

[68] JX 26; JX 39; JX 40.

[69] Tr. 569-72.

application to the New Castle County Department of Land Use are signed and certified by Mr. Kollias.[70]

New Castle County responded to K&G's application by advising:

> Due to the high turnover rate of a typical restaurant use, the access to the property to the south is important to maintain safe vehicular circulation. The access aisle on the north side of the building is marginally wide enough to accommodate two-way travel. Please provide a cross access/shared maintenance agreement to this office and the Department of Law . . . The 20.8' wide area in the rear of the building, that was left unmarked from parking, may be used to improve vehicular circulation. The agreement will need to be accepted prior to plan approval.[71]

The Delaware Department of Transportation also responded to the record plan with the suggestion that "[a] combined access with the parcel to the north or south should be considered along Concord Pike."[72]

In Merestone's response to these comments, Gregor wrote:

> Cross access through the property to the south is not viable. It is expected that the owner will resist cooperation. . . . We have configured the parking in the back to potentially allow physical access between this property and the one to the south should the opportunity present itself.[73]

---

[70]  JX 26; JX 82.

[71]  JX 19.

[72]  JX 20.

[73]  JX 22; JX 23.

14

Gregor testified that he discussed these responses with Mr. Kollias before they were submitted; the responses were based on discussions he had with Mr. Kollias; and Mr. Kollias accepted and was aware of the responses.[74]  Mr. Kollias was sent copies of the various documents containing the comments.[75]  Mr. Kollias testified at trial that he never had any discussions with the owner of the property to the south of the 2720 Property.  He also stated that Merestone's statements were not accurate because he believed he already had a right to a cross-access easement.[76]

Eventually, the Delaware Department of Transportation and New Castle County Department of Land Use approved the plans, and the final parking plan and record plan do not mention an easement.[77]  Gregor testified that no plan was ever approved that showed a cross-access easement.[78]

### 3. K&G constructs the Claymont Steak Shop and Charcap erects barriers

The construction permit was issued to K&G on September 11, 2014, and the demolition of the old building and construction of the new structure began around

---

[74]     Tr. 582-86.

[75]     JX 417.

[76]     Tr. 202-04.

[77]     JX 39; JX 40.

[78]     Tr. 575-76.

that time.[79]  Kryak, the site construction manager, directed contractors to use the Woodrow Avenue traffic light and cross over the Charcap Property to access the 2720 Property because in most cases "they were longer vehicles, trailers, backhoes, that kind of thing, and they could not get in from right in front of Claymont Steak Shop."[80]  During demolition, a construction fence was put up for safety concerns, and during that time, the only direct access to the property available was to enter at the Woodrow Avenue traffic light and cross the Charcap Property.[81]

Capano testified at trial that he wanted to be neighborly and allowed the construction vehicles to use the property for access.[82]  Even though Capano was concerned about larger trucks or equipment coming across his property, he was willing to allow it because it was a temporary situation.[83]  Capano further testified that he had a conversation with Mrs. Kollias on his property shortly before she opened the restaurant; they discussed the fact that he had been a good neighbor and

---

[79]     JX 50; Tr. 519-20 (Kryak).

[80]     Tr. 510-11 (Kryak).

[81]     *Id.* at 507-10.

[82]     *Id.* at 463-64.

[83]     *Id.*

allowed her to use his property for the construction.[84]  He testified that no one had ever approached him regarding cross access over the property.[85]

Mrs. Kollias testified that the conversation with Capano occurred after Patel informed her that Capano was going to put up a fence to block her use of the Charcap Property.[86]  Mrs. Kollias testified that on the same day, Capano told her that Patel wanted him to put a fence up because her restaurant was going to create a lot of traffic.[87]

Shortly before the opening of the restaurant in October 2015 and towards the end of construction, parking block strips were placed on the Charcap Property.[88] Vehicles continued to drive over the parking blocks, and the Defendants placed a second layer of parking block strips across their property.[89]  Both Patel and Sciota, the general manager of the Charcoal Pit, testified that after the opening of the Claymont Steak Shop, the frequency of traffic over the Charcap Property increased

---

[84]     *Id.* at 465-66.

[85]     *Id.*

[86]     *Id.* at 27-28.

[87]     *Id.* at 31.

[88]     *Id.* at 68 (D. Kollias); *id.* at 513 (Kryak).

[89]     *Id.* at 513 (Kryak); PTO ¶ 26.

17

significantly, and safety concerns arose.[90] The type of vehicle also became a concern; 18-wheel trucks were crossing the property, obstructing parking for long periods of time, and leaving the property in an unsafe manner.[91] Sciota became concerned about liability and voiced this to Capano.[92] In response, on July 7, 2016, Sciota had a fence erected on the Charcap Property.[93] After delivery trucks continued parking and obstructing the Charcap Property's parking lot to deliver to Claymont Steak Shop, Sciota instructed that the fence be extended in September 2016.[94]

## C. Parties' Contentions

Plaintiffs seek a declaratory judgment that they have acquired an easement by prescription and by estoppel over Defendants' Charcap Property. Plaintiffs also seek an injunction preventing Defendants from obstructing access across the Charcap Property to the 2720 Property. Defendants answer that no easement over the Charcap Property exists; thus, there is no right to a permanent injunction.

---

[90] Tr. 624-30 (Patel); *id.* at 649-53 (Sciota).

[91] *Id.* at 650 (Sciota); *id.* at 625 (Patel).

[92] *Id.* at 656 (Sciota); *id.* at 466-68 (Capano).

[93] PTO ¶ 28; Tr. 655 (Sciota).

[94] Tr. 655-56, 667 (Sciota); JX 83; PTO ¶ 30.

18

Defendants also argue that Plaintiffs' claims are barred by laches, unclean hands, and waiver/abandonment.[95]

## II. ANALYSIS

Plaintiffs assert that they have an implied easement under two exceptions to the statute of frauds—easement by prescription and easement by estoppel. Because easements by prescription evade the requirements of the statute of frauds and "work a forfeiture of title," they are disfavored.[96] Therefore, the Court employs a heightened evidentiary standard, and the claimant "must establish each element by evidence that is clear and convincing."[97] Similarly, because estoppel is an equitable doctrine that creates an exception to the statute of frauds, "a party seeking to enforce a parol contract faces an enhanced evidentiary burden, and must demonstrate by clear and convincing evidence that such an exception is applicable."[98] This

---

[95] Defendants also argue that certain of Mrs. Kollias's testimony at trial regarding the purported easement should be excluded and certain of Mr. Kollias's testimony regarding the easement by prescription should be excluded. Defendants also argue that certain exhibits should be excluded as hearsay. Because I do not rely on any of the enumerated exhibits or testimony, and because I ultimately rule that Plaintiffs have not established the right to an easement, I need not decide these matters.

[96] *Dewey Beach Lions Club*, 2006 WL 701980, at *3 (Del. Ch. Feb. 24, 2006) (citing *Anolick v. Holy Trinity Greek Orthodox Church, Inc.*, 787 A.2d 732, 740 (Del. Ch. 2001); *Berger v. Colonial Parking, Inc.*, C.A. No. 1415-VCH (May 20, 1993) (OPINION)).

[97] *Id.*

[98] *Hionis v. Shipp*, 2005 WL 1490455, at *4 (Del. Ch. June 16, 2005), *aff'd*, 903 A.2d 323 (Del. 2006).

19

heightened standard "recognizes that non-compliance with the regular formalities required of real estate transactions should not be lightly tolerated," and a plaintiff must provide "very strong evidence, which leaves the court with the same degree of certainty that a formal written contract ordinarily provides."[99]

## A. Plaintiffs Have Not Established an Easement by Prescription

In order to obtain an easement by prescription, the claimant "must demonstrate that he, or a person in privity with him," used the burdened estate "(1) openly, (2) notoriously, (3) exclusively, and (4) adversely to the rights of others for an uninterrupted period of 20 years."[100] Defendants do not dispute that Whitten, who owned the 2720 Property from 1961 to 2012, was in privity with Plaintiffs; therefore, I turn to whether Plaintiffs have shown by clear and convincing evidence that the use of Defendants' property satisfied the elements necessary to create an easement by prescription.[101]

---

[99]     *Id.*

[100]    *Dewey Beach*, 2006 WL 701980, at *3 (citing *Anolick*, 787 A.2d at 740).

[101]    JX 416, Ex. B; JX 314, at 12. Plaintiffs and Defendants dispute when the prescriptive period should begin, but I need not decide this issue because Plaintiffs have not proven the elements necessary for an easement by prescription. Pls.' Opening Br. 26; Defs.' Answering Br. 31.

Plaintiffs claim Whitten operated a photography studio on the second floor of the property from 1964 until 1999.[102] Although Plaintiffs presented evidence that Whitten maintained a storage space in the back of the property and would himself visit the property from time to time for maintenance, Plaintiffs did not present any credible evidence to show that Whitten, his customers, or his service agents used the Charcap Property after 1999.

Instead, Plaintiffs focused on Whitten's tenants' usage of the land during the relevant time period. From September 1, 1993, until November 30, 2012, various mattress stores leased part of the 2720 Property from Whitten.[103] Under Delaware law "use by a tenant can be employed in finding the requisite prescriptive period only when such use can be said to have been expressly or impliedly (from the circumstances) embraced within the terms of the tenancy itself."[104] "Otherwise, it

---

[102]    Pl.'s Opening Br. 36.

[103]    PTO ¶ 14. Because this period satisfies the requisite amount of time, I need not look to prior tenants' use.

[104]    *Toto v. Gravino*, 144 A.2d 237, 239 (Del. Ch. 1958); *see also* BRUCE & ELY, THE LAW OF EASEMENTS & LICENSES IN LAND § 5:19 (Thomson Reuters 2017) ("Some jurisdictions, however, adhere to the view that adverse use by a tenant inures to the benefit of the landlord only when the asserted easement is within the express or implied terms of the lease.") (citing *Toto*, 144 A.2d 237).

would merely be a continuing trespass by the tenant, the benefit of which the landlord could not claim."[105]

The easement is not expressly contained in the lease between Whitten and the mattress stores.[106] The question, therefore, is whether any easement over the Charcap Property is implied in Whitten's lease with the mattress stores. In *Toto v. Gravino*, the Court found an implied easement in the lease where evidence at trial revealed that the original landlords believed they had the right to and did use the alley at issue. The Court found, post-trial, that the subsequent tenants and ultimate successors-in-interest believed the leases "covered the right of such tenants to use the alley; the tenants also so believed and acted upon that belief; when the plaintiffs purchased the property in 1943, they believed they had the right to use the alley."[107] The Court in that case stressed that "the physical appearance of the particular alley in relation to plaintiffs' property and the established 'use' pattern were of additional

---

[105] *Toto*, 144 A.2d at 239.

[106] JX 358. The lease mentions the tenant's "right of non-exclusive use of the side and rear parking areas of the Building in conjunction with the occupant of the upper floor of the Building." *Id.* at 2. This language does not speak to the purported easement over the Charcap Property. This analysis is consistent with Rosen's testimony at trial confirming that this language does not address how one enters or leaves the property. Tr. 426.

[107] *Toto*, 144 A.2d at 239.

compulsive importance" in finding the implied easement.[108] "[T]he alley [was] the only means to obtain access from the front of the property to the alley side and the rear of plaintiffs' premises" and had for more than twenty years been used by the previous landlords, tenants, and "persons servicing the property."[109] Notably in *Toto*, the Court found that the evidence showed the plaintiffs had occupied the land themselves as owners for over fifteen years and the previous landlords themselves had occupied the property and used the easement.[110]

In *Berger v. Colonial Parking, Inc.*, this Court distinguished *Toto* and refused to impute the tenant's use of the easement to the prior landlords because there was no evidence of the prior landlords' own use of the easement.[111] "[T]here can be no privity of estate between the owner-landlord and its tenant as to the easement and the tenant's use cannot be imputed to the owner-landlord even if the tenant believed that the easement was covered by the lease" unless the owner-landlord used or had a claim to the easement himself.[112]

---

[108]  *Id.*

[109]  *Id.*

[110]  *Id.*; *cf. Berger v. Colonial Parking, Inc.*, 1993 WL 2087061, at *5-6 (Del. Ch. June 9, 1993).

[111]  *Berger*, 1993 WL 2087061, at *6.

[112]  *Id.* (citing 4 TIFFANY, THE LAW OF REAL PROPERTY § 1146, at 778 (3d ed. 1975)).

23

Here, Whitten died in 2012 and, thus, was unable to testify at this trial. Not a single witness of the thirteen witnesses at trial credibly testified to having personal knowledge of Whitten's use of the Charcap Property during his ownership of the 2720 Property. Similarly, none of the 421 exhibits presented evidence of Whitten's actual use of the Charcap Property during that time.[113] Thus, Plaintiffs did not present clear and convincing evidence that Whitten believed he had a claim to or used the easement.[114] As such, Plaintiffs have not met the requisite prescriptive period necessary to establish an easement by prescription, and this claim is denied.[115]

## B. Plaintiffs Have Not Established an Easement by Estoppel

"[A]n easement by estoppel is created when 1) a promisor's representation that an easement exists has been communicated to a promisee; 2) the promisee believes the promisor's representation; and 3) the promisee acts in reliance upon the

---

[113] *Dewey Beach Lions Club, Inc. v. Longanecker*, 2006 WL 701980, at *5 (Del. Ch. Feb. 24, 2006).

[114] Additionally, even if Plaintiffs had made the requisite showing as to Whitten's use, there are significant time gaps, specifically from 1996-2002, for which they presented no evidence regarding the use of the purported easement.

[115] Also, even if I were to tack the prior tenants' use of the property to the current owners, the Plaintiffs have not established by clear and convincing evidence that the mattress stores' use of the Charcap Property was of the same scope the Plaintiffs now claim. At trial, McDonald testified that the mattress stores received deliveries once a week and that perhaps a handful of customers visited the store a day. Plaintiffs on the other hand, run a restaurant that serves several dozen customers a day and requires weekly large shipments from multiple 18-wheel trucks. *See* JX 40 (traffic generation diagram). "The scope of a prescriptive easement is defined by the character and nature of the use that created it." 28A C.J.S. Easements § 193.

24

promisor's representation."[116]  At trial, Plaintiffs admitted that no one ever expressly told them that an easement existed over the Charcap Property.[117]  Instead, Plaintiffs argue that Defendants' (1) allowance of access over the Charcap Property to remain open during the competitive bidding process for the 2720 Property, (2) permission for Plaintiffs' construction vehicles to use the Charcap Property, and (3) failure to discuss the purported easement with the Kolliases despite a duty to disclose satisfies the first prong of the test necessary to prove an easement by estoppel.

In support of their first argument, Plaintiffs point to the use of the Charcap Property while Plaintiffs and Defendants were engaged in a bidding war over the 2720 Property.  Plaintiffs argue that they believed that the path over the Charcap Property was "an easement and would remain open" because use of the Charcap Property "remained open" despite "increased bidding by Defendants."[118]  Plaintiffs do not explain how a competitive bidding process creates a representation or impression that an easement exists.  Moreover, "[a]n easement by estoppel claimant cannot rely on an assertion that may be checked easily in the public records or that

---

[116]  *Hionis v. Shipp*, 2005 WL 1490455, at *4 (Del. Ch. June 16, 2005), *aff'd*, 903 A.2d 323 (Del. 2006) (citing *Hammond v. Dutton*, 1978 WL 22451, at *3 (Del. Ch. Dec. 20, 1978)).

[117]  Tr. 64 (D. Kollias), 158 (B. Kollias).

[118]  Pls.' Opening Br. 48.

is contrary to information in the claimant's possession."[119]  Mr. Kollias testified at trial that there was no recorded easement.[120]  In fact, representations that there were no easements across the property appeared in a title search and Mrs. Whitten's title affidavit.[121]  All relevant information pointed to the fact that no easement existed.

The permission for the construction vehicles to use the Charcap Property temporarily does not create a representation that a permanent easement for large delivery vehicles and dozens of customers exists.[122]  Moreover, "[c]ourts are reluctant to find an easement by estoppel on the basis of 'mere passive acquiescence.'"[123]  While there may be a duty to disclose the existence of an easement (or lack thereof) where "the servient estate owner observes the claimant improving the servient estate," this duty usually does not attach where "the servient

---

[119]  BRUCE & ELY, THE LAW OF EASEMENTS AND LICENSES IN LAND § 6:1 (Thomson Reuters 2017).

[120]  Tr. 153, 155, 216-222.

[121]  Tr. 150-53 (B. Kollias); JX 30; JX 43, at 9.

[122]  Even if it could be said that Plaintiffs somehow relied on this permission to their detriment, the allowance of construction vehicles on a necessarily temporary basis is an easement of a different scope than the permanent allowance of frequent large delivery trucks and dozens of customers a day.  *See* JX 40 (traffic generation diagram).

[123]  BRUCE & ELY, *supra* note 119, § 6:1. "[O]ne's mere acquiescence in the making of improvements by another for the purpose of making a use of the latter's land, which involves a violation of a natural right appertaining to the former's land, involves no estoppel to deny the existence of an easement in diminution of such natural right." 3 TIFFANY, THE LAW OF REAL PROPERTY § 801 (3rd ed. Thomson Reuters 2016).

estate owner stands by while the claimant improves the claimant's own property, the alleged dominant estate."[124]  Here, Defendants did not observe Plaintiffs somehow improving the *Charcap Property*, the alleged servient estate, in anticipation of its use; rather, they allowed Plaintiffs' construction vehicles to improve Plaintiff's own 2720 Property, the alleged dominant estate.  "Furthermore, there is authority that an obligation to speak does not arise when a claimant is already in possession of the relevant information."[125]  Here, the Kolliases were aware that no easement existed over the property from various sources.[126]  Thus, no omission by Defendants created an easement by estoppel.

Finally, Plaintiffs argue that based on the 2530 Property record plan, Defendants had a duty to discuss the cross-access between the properties.  The 2530 Property record plan refers to the parcel directly to the south of the Charcap Property,

---

[124]    BRUCE & ELY, *supra* note 119, § 6:1.

[125]    *Id.*

[126]    For example, the title search showed no easement existed over the Charcap Property; an appraisal report listed the entrance to the 2720 Property directly from Concord Pike; the parking plan prepared by the Kolliases' land surveyor and *signed and certified by Mr. Kollias himself* contained no representation of an easement; Mrs. Whitten certified that she never had an easement over the Charcap Property; and DelDOT and the Department of Land Use's communications discussed no cross access over the Charcap Property and suggested an attempt to obtain such cross access.  Tr. 153, 155, 216-222 (Kollias), 575 (Gregor); JX 15; JX 19; JX 20; JX 26; JX 31; JX 43.

27

where the Bella Coast restaurant currently operates.[127]  The relevant portion of the

2530 Property record plan states:

> The Developer should pursue a cross-access agreement
> with the parcel to the north to establish an interconnection
> with the existing Charcoal Pit restaurant so that traffic may
> utilize the signal located at the intersection of US Route
> 202, Woodrow Avenue, and the Charcoal Pit entrance.[128]

Plaintiffs argue that this record plan shows an "assemblage of parcels" that includes

the 2530 Property and the Charcap Property.[129]  Thus, Plaintiffs argue, the reference

in the record plan to the "parcel to the north" or the "adjacent property to the north"

is a reference to the 2720 Property.  This interpretation, however, is contradicted by

the document itself.[130]  The document defines the site solely as the 2530 Property;

therefore, any discussion of the parcel to the north is in fact the Charcap Property.

There is no discussion of an easement with the 2720 Property.[131]

---

[127]   JX 28; JX 280; Tr. 289-93 (Johns).

[128]   JX 28; JX 280, n.33A.

[129]   Pl.'s Opening Br. 51.

[130]   Plaintiffs attempt to discredit the testimony of Johns, the preparer of the document, because he was compensated for his testimony and has done many projects for the Defendants.  Plaintiffs offer no credible evidence as to why Johns was an unreliable witness or why the plain wording of the document should be ignored.  Pl.'s Opening Br. 51 n.40.

[131]   In addition, Plaintiffs actually point to the analogous record plan for the 2720 Property, which contains no mention of easements or the pursuit of easements for the 2720 Property and is signed and certified by Mr. Kollias.  Pl.'s Opening Br. 51

28

Plaintiffs have not met the heightened evidentiary burden to prove that Defendants made a representation that an easement existed over the Charcap Property. Because Plaintiffs have not satisfied the first element, I need not discuss the other two elements for the creation of an easement by estoppel. Additionally, because I do not find that Plaintiffs are entitled to an easement over Defendants' property, I need not discuss Defendants' affirmative defenses.

## III. CONCLUSION

For the foregoing reasons, I find that Plaintiffs do not have an easement over Defendants' property either by prescription or by estoppel, and Plaintiffs' claims are denied.

**IT IS SO ORDERED**.

---

n.40; JX 26. This actually provides even more evidence for the fact that no easement was being discussed, contemplated, or pursued; *see supra* note 126.

29